IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 21, 2010

## STATE OF TENNESSEE v. DEMANCE MARSHALL BEASLEY

**Appeal from the Criminal Court for Davidson County**
**No.2008-C-2849     Monte Watkins, Judge**

_____

**No. M2009-01188-CCA-R3-CD - Filed May 21, 2010**

_____

The Defendant, Demance Marshall Beasley, was charged with: one count of attempted especially aggravated robbery, a Class B felony, see Tennessee Code Annotated sections 39-13-403(b), -12-107(a); one count of attempted first degree murder, a Class A felony, see Tennessee Code Annotated sections 39-13-202(c), -12-107(a); and one count of aggravated assault, a Class C felony, see Tennessee Code Annotated section 39-13-102(e)(1). Following a jury trial, he was convicted as charged.  In this direct appeal, he contends that: (1) the State presented evidence insufficient to convict him; (2) the trial court erred by foreclosing cross-examination of the victims regarding their drug usage; and (3) the trial court improperly instructed the jury regarding identification of the Defendant as the perpetrator of the crime. After our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Richard Tennent, Nashville, Tennessee, for the appellant, Demance Marshall Beasley.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

The events underlying this case began during the early morning hours of December 12, 2006. Jackie Westmoreland, one of the victims, testified that he had spent some time at 908 Fourteenth Avenue North, the residence of the daughter of his sister, Terri Westmoreland. At about 3:00 a.m., he stood on the sidewalk outside that residence waiting for his girlfriend to pick him up. As he waited, a white four-door car with a blue top pulled up next to him. A man with a gun got out of one of the vehicle's passenger doors and ran up behind Mr. Westmoreland; at trial, Mr. Westmoreland identified this man as the Defendant.

Mr. Westmoreland turned around, at which point the Defendant pointed a black gun at his face. The Defendant said, "Do you know what time it is?" Mr. Westmoreland replied, "What you mean?" The Defendant repeated himself and hit Mr. Westmoreland on the head with his gun, which stung but did not cause any bleeding. The Defendant ordered Mr. Westmoreland to empty his pockets. Mr. Westmoreland responded that he did not have anything of value and began to turn away. The Defendant then shot him below one of his knees. Mr. Westmoreland fell to the ground; the Defendant pointed the gun at his chest.

The Defendant's sister, Ms. Westmoreland, had been around the side of her daughter's house; apparently hearing the gunshot, she ran around the corner of the house to the sidewalk area. As she passed the Defendant, Mr. Westmoreland heard him say, "What you doing?" Ms. Westmoreland continued to run toward the nearby porch area of her daughter's house; the Defendant then fired his gun at her head. Ms. Westmoreland ducked, however, and the bullet missed her. The Defendant stood silently in front of Mr. Westmoreland for a short period of time, during which Ms. Westmoreland's daughter began watching the scene from inside her residence's front screen door. The Defendant then returned to the white four-door car. Just before getting into the car, the Defendant fired another shot at Mr. Westmoreland's sister. The shot missed. The Defendant entered the car and drove away.

The police were called. Mr. Westmoreland briefly spoke to the police while waiting for an ambulance; because of the pain from his gunshot wound, however, he could not remember everything he said. Mr. Westmoreland was taken to Vanderbilt University Medical Center ("VUMC"), where he remained for three days. During an operation performed there, doctors inserted twelve pins and a metal rod into his injured leg.

After Mr. Westmoreland was released from VUMC, he was contacted by Metro Nashville Police Department ("MNPD") Detective Robert Anderson. Mr. Westmoreland told Det. Anderson what had happened, and described his assailant as having worn black

pants and a hooded sweatshirt. He also said his assailant had plats styled into his hair. Mr. Westmoreland did not give a description of his assailant's facial features. At that time, Mr. Westmoreland did not know the Defendant's name; Det. Anderson therefore told Mr. Westmoreland to contact him if he discovered any additional helpful information. Three weeks later, Mr. Westmoreland saw the Defendant on television and recognized him. He met Det. Anderson and identified the Defendant using a photo lineup. At trial, Mr. Westmoreland viewed a picture of a vehicle the Defendant was later found driving, and identified it as the one the Defendant had left in on December 12, 2006. He also viewed a picture of a gun, later found in the Defendant's possession, and said it looked like the one the Defendant had used to shoot him.

On cross-examination, Mr. Westmoreland described the in-court Defendant as wearing black jeans, when he was in fact wearing blue jeans. Mr. Westmoreland acknowledged that he had some problems with his vision.

Ms. Westmoreland also testified. She confirmed that her daughter and grandchildren lived at 908 Fourteenth Avenue North. At about 3:00 a.m. on December 12, 2006, she had intended to walk around the corner of her daughter's house to a friend's house nearby. As she began her walk, she saw a white car with a blue top pull up near Mr. Westmoreland, who was standing on the sidewalk. As she turned the corner, she heard a gunshot. Returning to the front of her daughter's house, she saw Mr. Westmoreland lying on the ground with a gunshot wound in his leg. Because of a nearby streetlight, she could clearly see a man standing over him with a gun. At trial, Ms. Westmoreland identified this man as the Defendant.

On cross-examination, Ms. Westmoreland said that she asked Mr. Westmoreland whether he had been shot; at the time she did so, she was about five feet away from him and the Defendant. The Defendant shot at her as she continued to move toward the house, but did not say anything to her. He fired again immediately before she reached the house's porch area. Ms. Westmoreland later spoke to police and only vaguely described the assailant as a large black male. She was never shown a photo lineup, and the police did not ask her about the assailant's facial features. She noted that she saw two other men in the white, blue-top car.

MNPD Sergeant Jason Proctor testified that he served as a detective at the time of the events underlying this case. He was dispatched to 908 Fourteenth Avenue North at about 3:30 a.m. on December 12, 2006. He was either the first or second responder. When he arrived, he saw Mr. Westmoreland on the sidewalk with what appeared to be a gunshot wound to his right knee. Sergeant Proctor spoke to both Mr. Westmoreland and Ms. Westmoreland. Both described their assailant's car and said he had braided hair, a red shirt,

and blue jeans. They did not describe the assailant's facial features. Mr. Westmoreland told Sgt. Proctor that his assailant had told him to "come out of [his] pockets," which Sgt. Proctor recognized as a common demand in a robbery.

A search of the area revealed two .45 caliber shell casings. Sergeant Proctor found one next to Mr. Westmoreland and one in the street nearby. At some point, Sgt. Proctor cordoned off the area with crime scene tape and called the MNPD Crime Scene Identification Division ("CSID"). He noted on cross-examination that he looked for, but did not find, bullet strikes on Ms. Westmoreland's daughter's house. He also noted that Ms. Westmoreland originally told him that she saw three other men in the car from which her assailant exited.

MNPD CSID Officer Warren Fleak testified that he investigated the scene of the crime in this case. He arrived after Mr. Westmoreland had been taken to VUMC. After introducing photos of the scene, Officer Fleak noted that he found no projectiles in the area and could locate no bullet strikes on Ms. Westmoreland's daughter's house.

MNPD Sgt. Dean Martin testified that, on December 12, 2006, he received information about the shooting of Mr. Westmoreland and was therefore aware of the description the Westmorelands had given of their assailant and his vehicle. On January 6, 2007, Sgt. Martin saw a vehicle matching the description he had received. He followed the vehicle and pulled up behind it as it parked. Sergeant Martin saw the Defendant in the driver's seat. The vehicle had no other occupants.

Sergeant Martin arrested the Defendant, recovering from his front right pocket a loaded semi-automatic .45 caliber pistol. A search of the car revealed another pistol hidden in the back seat. Sergeant Martin noted that the vehicle had a temporary license tag with an expiration date of "01/14/07," and that such temporary tags are typically valid for thirty days. Sergeant Martin acknowledged that the tag therefore supported an inference that the vehicle had been purchased on or about December 14, 2006. He did not know whether the Defendant owned the car.

MNPD Officer Martin Burns testified that he spoke to the Defendant on January 6, 2007, after the Defendant had been taken into custody. The Defendant referred to the .45 pistol Sgt. Martin recovered as "my gun," and twice admitted that the gun belonged to him. Officer Burns testified that the gun had been reported stolen to the Columbia Police Department sometime prior to the date the victim was shot.

MNPD Det. Robert Anderson testified that he worked from 3:30 p.m. to midnight on December 12, 2006. He was given the collected reports of the other detectives and officers

that had worked on this case. Detective Anderson contacted Mr. Westmoreland and listened to his account of the events underlying this case. Mr. Westmoreland did not know his assailant's name, but was "very confident that he saw the person that shot him and shot at his sister."

On or about January 8, 2007, Mr. Westmoreland contacted Det. Anderson and said he had seen his assailant on television. Detective Anderson prepared a photo lineup and showed it to Mr. Westmoreland; Mr. Westmoreland "very quickly" identified the Defendant as his assailant. Detective Anderson did not speak to Ms. Westmoreland and consequently did not show her a photo lineup.

Special Agent Robert Royse of the Tennessee Bureau of Investigation was qualified as an expert in firearms identification. He testified that he tested the .45 caliber pistol recovered from the Defendant and the two .45 caliber shell casings recovered from the crime scene in this case. He identified the pistol as a Ruger Model P97 DC .45 caliber semi-automatic. He noted that the pistol was in working condition and that it contained four live cartridges at the time it was submitted. Agent Royse's testing revealed that the shell casings he tested were fired from the .45 caliber pistol. He noted on cross-examination that there was no way to say when the cartridges had been fired or whether they had been fired at about the same time.

The Defendant chose to testify in his own defense. He said he had never seen Mr. or Ms. Westmoreland before, and that at the time of the shooting he had been in the hospital with his pregnant girlfriend, who gave birth on December 13, 2006. Before that time, he had driven a 1993 Buick LeSabre. He had recently wrecked that car, however. On December 14, 2006, the Defendant's aunt bought a white, blue-topped 1991 Mercury Grand Marquis and gave it to the Defendant to drive. Others also drove the car. The Defendant said he had not altered the vehicle's temporary tag.

The Defendant testified that he bought the .45 caliber pistol on the street for $40 two days before Christmas 2006. He suspected that the gun was stolen. He carried it for protection, and had not known about the other pistol in his vehicle. The Defendant said he had never been to 908 Fourteenth Avenue North, but acknowledged on cross-examination that he was familiar with the area and that Sgt. Martin had arrested him about a block from that address. The Defendant also acknowledged that he had been convicted in 2006 of altering a car's temporary tag.

The Defendant was convicted as charged. He now appeals.

**Analysis**

## I. Timeliness of Appeal

The Defendant's judgments were entered on December 17, 2008. The Defendant failed to file a notice of appeal until May 22, 2009, far beyond the thirty days allowed after an entry of judgment. Tenn. R. App. P. 4(a). "However, in criminal case the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Id.

Through new appellate counsel, the Defendant has provided information establishing that his trial counsel, Reginald Horton, continued to represent him until Mr. Horton's law license was suspended on April 17, 2009. This suspension resulted from Mr. Horton's indictment on drug, theft, and money laundering charges.

The Defendant's appellate counsel has provided a sworn affidavit detailing his involvement in this case. On May 15, 2009, appellate counsel was appointed to represent the Defendant in a separate case. Pursuant to this representation, appellate counsel researched the Defendant's history on May 22, 2009, and discovered that no motion for a new trial or notice of appeal had been filed in this case. Appellate counsel filed a notice of appeal on that day. On May 26, 2009, appellate counsel was appointed to represent the Defendant in this appeal.

Appellate counsel's affidavit also alleges that Mr. Horton failed to respond to the State's pretrial motions, failed to file any pertinent motions in limine, and that the Defendant "did not choose to have Mr. Horton waive any of his appellate rights" and was unaware of Mr. Horton's failure to meet procedural requirements. Under these unusual circumstances, we elect to waive the requirement that the Defendant file a timely notice of appeal and address his appeal on its merits.

## II. Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the convicting evidence, contending that the evidence was insufficient to identify him as the Westmorelands' assailant. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after

considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant's brief launches an attack on the shortcomings of eyewitness identification generally, and under the circumstances of this case, largely applying State v. Dyle, 899 S.W.2d 607 (Tenn. 1995), in which our supreme court discussed those shortcomings and developed a pattern identity instruction. See id. at 612. The Defendant uses that instruction to generally argue against the reliability of his identification by the Westmorelands.

The Defendant is correct that Mr. Westmoreland did not describe his assailant's features to police and did not identify the Defendant as his assailant until seeing him on television.[1] He is also correct that Ms. Westmoreland identified him only once, in court, while he sat at the courtroom's defense table. Finally, the Defendant notes that the Westmorelands viewed their assailant only briefly and under extremely stressful circumstances. The Defendant therefore contends that no reasonable juror could have found that the State proved beyond a reasonable doubt his identity as the perpetrator of these crimes.

We disagree. Detective Anderson testified that Mr. Westmoreland told him he was "very confident that he saw the person that shot him and shot at his sister." Most damning, however, is the fact that the Defendant was arrested on January 6, 2008, in possession of the pistol used by the Westmorelands' assailant and driving a car matching the description of the

---

[1]Based on trial comments by the State, it appears that Mr. Westmoreland saw the Defendant identified on television as the man who had murdered his cousin. This information, of course, was not shared with the jury in this case.

vehicle used by their assailant. Apart from their independently probative nature, these facts tend to bolster the reliability of the Westmorelands' identifications.

The Defendant characterizes as "unfortunate accidents" the fact that he "purchased the . . . weapon some ten days after the crime" and "use[d] . . . a vehicle resembling the robbery vehicle, beginning some two days after the crime." Only his own testimony established these methods of procuring both the pistol and the car, however; the jury was not required to credit this testimony, and obviously chose not to do so. We conclude that this evidence was sufficient to allow a reasonable jury to find that the Defendant's identity was proven beyond a reasonable doubt. See Jackson, 443 U.S. at 319. This issue is without merit.

## III. Waived Issues

By virtue of his failure to file a motion for a new trial, the Defendant has waived the remaining issues, which we discuss hereinafter in a plain error analysis. See Tenn. R. App. P. 3(e). We must therefore decline to grant relief unless the Defendant can demonstrate plain error. Tenn. R. App. P. 52(b). Plain error requires that five factors be established: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App.1994).

### A. Variance between Indictment and Proof

The indictment charging the Defendant with attempted especially aggravated robbery alleges that the Defendant "did attempt to commit the offense of Especially Aggravated Robbery as defined in T.C.A. §39-13-403, in that he . . . did intentionally or knowingly, and by use of a deadly weapon, attempted to take from the person of [Mr.] Westmoreland, certain property, to wit: a sum of money of value . . . ." The Defendant argues that the State presented insufficient evidence to establish that he aimed to take "a sum of money" from Mr. Westmoreland.

In our view, the Defendant has incorrectly characterized this issue, which in essence is only a second challenge to the sufficiency of the State's evidence. Our sufficiency of the evidence review, however, asks only whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See Jackson, 443 U.S. at 319. The essential theft element of any robbery or attempted robbery is defined by Tennessee Code Annotated section 39-13-401, which requires only "intentional or knowing theft of property." Attempted especially aggravated robbery simply does not contain as an essential element the attempted theft of "a sum of money." Mr. Westmoreland testified that the

-8-

Defendant ordered him to empty his pockets, which is certainly sufficient to establish that the Defendant attempted to take property. The evidence is therefore sufficient to show that the Defendant committed attempted especially aggravated robbery, even assuming that this evidence was insufficient to show that the Defendant attempted to take money as opposed to other property.[2]  See Tenn. Code Ann. § 39-12-101(a), -13-403(a) (establishing the elements of attempted especially aggravated robbery).

The Defendant's argument appears to be that there was an impermissible variance between his indictment and the proof presented at trial. Tennessee no longer follows the early common law rule requiring the indictment and the proof to conform in all respects. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). "[B]efore a variance will be held to be fatal it must be deemed to be material and prejudicial." Id. Our supreme court has outlined the following rule for assessing whether a variance is prejudicial:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

Id; see also Berger v. United States, 295 U.S. 78, 82 (1935) (announcing the rule adopted in Moss).

We conclude that any variance between the proof and the Defendant's attempted especially aggravated robbery indictment was not prejudicial. The indictment correctly specifies the date, location, victim, and nature of the charged offense, and notes the sections of the Tennessee Code Annotated outlining the elements of attempted especially aggravated robbery. These details leave no possibility that the Defendant might be prosecuted again for the same offense. Further, the information contained in the indictment allowed the Defendant to prepare his defense of mistaken identity; the Defendant did not attempt to defend himself by claiming that he had attempted to steal property, but not "a sum of money," from Mr. Westmoreland. Because any variance was not prejudicial, we need not consider the issue of materiality. See Moss, 662 S.W.2d at 592. Because no clear and unequivocal rule of law was breached, the Defendant cannot demonstrate plain error. See Adkisson, 899 S.W.2d at 641. This issue is without merit.

---

[2]We express no opinion regarding whether this evidence was sufficient to establish that the Defendant attempted to take "a sum of money."

**B. Limited Cross-Examination**

At trial, the Defendant's trial counsel, Mr. Westmoreland, and the trial court engaged in the following exchange during a jury-out hearing:

> [Trial Counsel]: Your Honor, the only question is, had he been using drugs that night. I don't care about any other time he used drugs.
>
> [Trial Court]: Ask the question.
>
> [Trial Counsel]: Had you been using drugs that day, or that evening?
>
> [Mr. Westmoreland]: No.
>
> [Trial Counsel]: Okay. I mean –
>
> [Trial Court]: That's [sic] settles it right there. All right. It's not an issue now.

The Defendant contends that the trial court erred in foreclosing further cross-examination of Mr. Westmoreland regarding his potential drug use at the time of the crime and any previous drug use, drug sales, or gang membership. Again, the Defendant has waived this issue because he failed to file a motion for a new trial. See Tenn. R. App. P. 3(e). Further, the Defendant's trial counsel specifically expressed his disinterest in Mr. Westmoreland's general drug use; he merely wanted to discover whether Mr. Westmoreland was intoxicated at the time he was shot. The Defendant's trial counsel did not cross-examine Ms. Westmoreland on this issue, although she also denied being intoxicated at the time of the crime.

In his brief, the Defendant details at some length a hypothetical, successful cross-examination of Mr. Westmoreland in which Mr. Westmoreland "breaks" and admits that, at the time he was shot, he was intoxicated, selling crack cocaine for the "Crips," that his identification was therefore unreliable, and that his shooting was not an attempted robbery but an act of gang-related violence.

The record contains no evidence that any of this is actually true, however, as the Defendant did not submit an offer of proof during trial. The Defendant's trial counsel was also uninterested in investigating these issues; in the event that they have some basis in fact, the Defendant's argument may be a cognizable ground for a post-conviction petition. On direct appeal, however, we cannot conclude that the trial court erred in foreclosing further cross-examination after Mr. Westmoreland denied being intoxicated on December 12, 2006.

Without any evidence that the Westmorelands' testimony was unreliable, we have no basis on which to conclude that a grant of plain error review would be necessary to do substantial justice. See Adkisson, 899 S.W.2d at 641. This issue is without merit.

### C. Jury Instructions

Regarding the issue of identity, the trial court instructed the jury as follows:

[Trial Court]: The State must prove beyond a reasonable doubt the [D]efendant's identity as the person who committed the crime. If, after considering all the evidence in this case, you the Jury, are not satisfied beyond a reasonable doubt that the [D]efendant is this person, then you must find the [D]efendant not guilty.

The Defendant contends that the trial court should have given the longer identity instruction outlined in, and made mandatory by, State v. Dyle, 899 S.W.2d 607 (Tenn. 1995):

One of the issues in this case is the identification of the defendant as the person who committed the crime. The state has the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness, and its value may depend upon your consideration of several factors. Some of the factors which you may consider are:

(1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

(2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

Again, the state has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crime for which he or she is on trial. If after considering the identification testimony in light of all the proof you have a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

Id. at 612. We conclude that the trial court erred in failing to instruct the jury in accordance with Dyle, because the Defendant's testimony at trial put his identity as the assailant clearly at issue. See id. n.4.

Again, this issue is waived because the Defendant did not file a motion for a new trial. See Tenn. R. App. P. 3(e). The Defendant therefore must demonstrate plain error. The Defendant's trial counsel also did not request the instruction. "If identification is a material issue and the defendant does not request the instruction[], failure to give it will be reviewable under a Rule 52 harmless error standard." Id. Under harmless error analysis, "[r]eversal is [only] required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice." State v. Williams, 977 S.W.2d 101, 105 (citation omitted).

We conclude that this error was harmless and that consideration of the error as plain is therefore not necessary to do substantial justice. The Defendant was reliably identified by Mr. Westmoreland and later stopped in a vehicle that matched the description both Westmorelands gave. He admitted ownership of a pistol found on his person that matched with two shell casings found at the crime scene. There was, therefore, extensive evidence of the Defendant's identity as the Westmorelands' assailant. As a result, we conclude that the Defendant cannot show that the trial court's error more probably than not affected the result of his trial. Id. We decline to notice this issue as plain error.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the Defendant's convictions.

_____
DAVID H. WELLES, JUDGE

-12-